## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MARTIN BRUSTEIN, Individually and On Behalf )
of All Others Similarly Situated, )
 )
    Plaintiff, )
 )
 )
vs. )
 )
IRA B. LAMPERT, HARLAN PRESS, RICHARD )
M. FINKBEINER and CONCORD CAMERA )
CORP., )
 )
    Defendants. )



## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all other persons similarly situated, by and through his undersigned counsel, alleges the following upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel.

### NATURE OF THE ACTION

1. This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and 78t(a), and the regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5. The action is brought on behalf of all purchasers of the securities of Concord Camera Corp. ("Concord" or the "Company") during the period August 14, 2003 to May 10, 2004, inclusive, and who were damaged thereby.

2. On August 14, 2003, defendants caused Concord to issue earnings guidance, knowing (but failing to disclose) that such guidance was predicated upon the write-off of $3.4 million of the Company's excess, obsolete, and impaired inventory. Defendants further concealed the fact that the



Company's total excess, obsolete, and otherwise impaired inventory amounted to $12 million and that the Company would be incrementally writing off such inventory in the following quarters.

3.  The Company continued to conceal the magnitude of its excess, obsolete, and otherwise impaired inventory as it rolled out quarterly inventory-related charges to earnings of $3.4 million, $3.1 million, and $6.8 million during the Company's first three quarters of fiscal 2004. With each such partial disclosure, the price of the Company's stock dropped.



4.  The price of the Company's stock, which closed at $10.30 at the beginning of the Class Period, currently trades at approximately $2 per share.  Defendants were motivated to perpetrate the fraud to obtain increased borrowing availability from Concord's lender and to profit on the sale of Concord securities at an artificially inflated price.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b).   Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.   In addition, Concord maintains its principal executive offices in this Judicial District.

7.      In connection with the acts, conduct and other wrongs complained of herein, the defendants used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

8.      Plaintiff purchased Concord common stock during the Class Period and was damaged as a result of the wrongful acts of defendants alleged herein. Plaintiff's purchases are set forth in the certification attached hereto.

9.      Defendant Concord is headquartered in Hollywood, Florida.   As of May 2004, Concord had 28.45 million shares of common stock outstanding.   Concord stock trades on the Nasdaq under the ticker symbol "LENS."

10.     Defendant Ira Lampert is the President, Chief Executive Officer of the Company and Chairman of the Board.

11.     Defendant Harlan Press is the Vice President, Treasurer and Assistant Secretary.

12.     Defendant Richard M. Finkbeiner ("Finkbeiner") was the Chief Financial Officer and Senior Vice President throughout the Class Period. Finkbeiner stepped down as CFO of Concord effective July 27, 2004. Finkbeiner was succeeded by Donald D. Dawn ("Dawn") who became CFO effective August 2, 2004. Dawn resigned in just a few weeks, however, on Saturday, August 27, 2004. Dawn had 27 years of accounting experience before joining Concord and had held various positions at KPMG LLP.

## SUBSTANTIVE ALLEGATIONS

13.     On August 14, 2003, the start of the Class Period, the Company issued a press release in which defendant Lampert issued earnings guidance for the first quarter of fiscal 2004 as follows:

> Commenting on the short-term outlook for the Company, Mr. Lampert continued, "Providing long- term future guidance continues to be challenging. The economy remains difficult to forecast. Currently, for the first quarter of fiscal 2004, we anticipate revenues in the approximate range of $55 to $60 million <u>and net income in the approximate range of $2.1 to $2.7 million, or $0.07 to $0.09 per diluted share, before any non-cash variable stock option expense.</u>"

14.     Defendant Lampert's comments in the press release were materially false and misleading because they concealed the fact that the guidance provided included a planned partial write-off of excess, obsolete and otherwise impaired inventory and that the total of the Company's excess, obsolete and otherwise impaired inventory exceeded $12 million as of August 14, 2003 and would be written off against earnings, incrementally, during the Company's 2004 fiscal year.

15.     The August 14, 2003 press release had the desired effect. The price of the Company's stock jumped from a closing price of $9.45 on August 13, 2003 to a closing price of $10.30 August 14, 2003, and thereafter continued to climb.

-4-

16.     Defendant Press sold 48,000 shares at an artificially inflated price of $12.25 per share on August 28, 2003, reaping proceeds of $588,000.

17.     On November 6, 2003, the Company issued a press release announcing results for the first quarter ended September 27, 2003.  The press release stated:

For the first quarter ended September 27, 2003, net sales ("sales") were $57.4 million, a 90% increase over the same quarter last year. The net loss was $0.6 million, or $0.02 per share. This compared to sales of $30.2 million, and net income of $1.4 million, or $0.05 per diluted share for the first quarter of the prior fiscal year. Excluding this year's first quarter non-cash variable stock option expense of $3.1 million ($2.7 million after taxes), net income was $2.1 million, or $0.07 per diluted share. In addition, starting in fiscal 2004, the Company changed its method of applying manufacturing labor and overhead costs to inventory. The Company believes the new method will improve the matching of costs to the flow of product through the production processes. As a result of this change, the cost of products sold increased by $3.4 million for the first quarter and therefore gross profit and net income decreased by $3.4 million and $3.0 million, respectively, or $0.10 per diluted share. Since the effect of the change in the first quarter was to reduce by $3.4 million the amount of labor and overhead costs that would have been allocated to the Company's inventory at the end of the quarter under the prior method, cost of sales in subsequent quarters in fiscal 2004 should be commensurately reduced as inventories decline with an attendant increase in gross profit and net income.

Commenting on the financial results, Ira B. Lampert, Concord's Chairman, Chief Executive Officer and President, said, "Concord's sales for the first quarter of fiscal 2004 of $57.4 million was right in the middle of the range ($55 to $60 million) of the guidance we announced in August. Excluding non-cash variable stock option expense, net income was $2.1 million, or $0.07 per diluted share versus guidance of $2.1 to $2.7 million, or $0.07 to $0.09 per diluted share."

Mr. Lampert also said, "Sales from our Retail Sales and Distribution ("RSD") business for the first quarter of fiscal 2004 were $42.4 million, an increase of $16.5 million, or 64%, compared to the same quarter last year and accounted for 74% of total sales. This growth was in large part due to sales of Polaroid branded single use and traditional cameras, new digital product sales, new accounts and organic growth from existing accounts due to sell through and new product introductions. Sales from our Design and Manufacturing Services ("DMS") business were $15.0 million, an increase of $10.7 million, or 247%, compared to the same quarter last year and accounted for 26% of total sales. This increase was primarily due to single use

cameras being manufactured for Eastman Kodak Company under a supply agreement entered into in September 2002."

Mr. Lampert continued, "We are very pleased with the increased market penetration we experienced with all of our products in both of our RSD and DMS businesses. This increased penetration was primarily a result of opening new accounts, growth in existing accounts, increased digital camera product offerings and growth in our single use camera product offerings and sales.

18.     Because the previous guidance was in line with the reported earnings, the market recognized that the shocking $3.4 million decrease to inventory and associated charge to earnings was planned, although not previously disclosed. This lack of forthrightness caused the investment community to question the integrity of management, sending the price of the Company's stock into a tail spin. The price of the Company's stock, which closed at 13.95 the day before the announcement, dropped by 28% to close at 10 in an inordinate trading volume of 5,219,953 shares.

19.     On November 12, 2003, the Company filed its Form 10-Q for the quarterly period ended September 27, 2003 with the SEC ("the September 27, 2003 Form 10-Q"). This quarterly report, signed by defendant Finkbeiner, reflected substantially the same financial information presented in the November 6, 2003 press release.

20.     Unbeknownst to the investing public, the November 6, 2003 press release and the September 27, 2003 Form 10-Q were materially false and misleading because they failed to disclose that the total of the Company's excess, obsolete and otherwise impaired inventory had exceeded $12 million, that only $3.4 million of this total had been effectively written off against earnings (through a change in the method of accounting for inventory); and that the remaining sum would be written off over future quarters.

-6-

21.     Defendants Lampert and Finkbeiner each falsely signed certifications stating that the September 27, 2003 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

22.     The false and misleading statements were made, in part, to induce the Company's lender to increase the Company's borrowing capability.

23.     On January 16, 2004, the Company issued a press release announcing updated guidance for fiscal 2004 second quarter:

> Concord Camera Corp. ("Concord" or "Company") (NASDAQ: LENS) today announced that, based on current estimates, net sales for the second quarter ended December 27, 2003 are expected to be approximately $65 million, resulting in a net loss of between $(2.0) million and $(2.5) million, or $(0.07) to $(0.09) per share. The estimated net loss includes the recognition of a $(0.9) million loss related to short term investments and an approximate $2.5 million charge with respect to certain inventory and tooling primarily attributable to digital camera products.
>
> Concord had previously provided guidance for the second quarter of sales in the range of $70 to $75 million and net income in the range of $5.2 to $6.5 million, or $0.17 to $0.21 per diluted share, before any non-cash variable stock option expense.
>
> The disappointing results are primarily attributable to lower than anticipated digital camera sales coupled with lower than projected average selling prices. Furthermore, higher manufacturing costs primarily due to inefficiencies related to delays in the introduction of certain new digital camera product offerings were a significant contributing factor.
>
> The Company remains optimistic about the long term outlook. Revenues for the first six months increased more than 33% year over year and second quarter revenues represented a new sales record for all previous quarters. In addition, average selling prices of digital cameras for the quarter, although lower than expected, increased by 20% over the prior fiscal year. Concord is actively introducing new products, enhancing product design and development capabilities, fortifying sales and marketing infrastructure to address new sales channels and exploring a variety of strategic opportunities, including acquisitions.

Concord expects to report financial results for the second quarter or about February 5, 2004. The Company will provide additional details regarding second quarter results at that time.

24.     This press release was materially false and misleading because it failed to disclose that the total of the Company's excess, obsolete and otherwise impaired inventory had exceeded $12 million as of August 14, 2003, that only approximately half of this total had been effectively written off against earnings (a portion through a change in the method of accounting for inventory), and that the remaining sum would be written off against earnings in the following quarter.

25.     On February 5, 2004, the Company issued a press release announcing results for the second quarter and six months ended December 27, 2003.  This press release announced a $3.1 million inventory-related charge to earnings stating:

> For the second quarter ended December 27, 2003, net sales ("sales") were $65.1 million, a 5.2% increase over the same quarter last year. The net loss was $(2.9) million, or $(0.10) per share. This compared to sales of $61.8 million, and net income of $2.1 million, or $0.07 per diluted share for the second quarter of the prior fiscal year. This year's second quarter includes the pretax recognition of a $0.9 million loss related to the decline in fair value of certain short-term investments, which loss was realized upon the sale of the investments subsequent to the end of the quarter, <u>and a pretax $3.1 million charge with respect to certain inventory and tooling primarily attributable to digital camera products.</u>

26.     As stated in a transcript of the Company's February 5, 2004 Transcript (Q4 2003) Earnings Conference Call:

> Our net sales were below the guidance we issued in November of 70 to $75 million, but was in line with the revised guidance we issued this January of approximately $65 million...Our original guidance issued November 2003 for the second quarter was net income in the range of 5.2 million and 6.5 million, as compared to our revised guidance which was issued in January, of a net loss in the range of 2 $2.5 million, or a loss of approximately 7 to 9 cents per diluted share before non-cash variable stock option options.

<u>The difference between the net loss at the high end of the revised guidance and the actual net loss for the second quarter is the result of a more conservative view related to the inventory and tooling charges that were previously announced</u>. This year's second quarter loss included the recognition of a $900,000 loss from the sale of short-term investments which occurred subsequent to the end of the quarter, <u>and a $3.1 million charge with respect to certain inventory and tooling, primarily attributable to the digital camera products</u>; in particular, the three megapixel CCD internal 3X optical zoom digital camera, which significantly underperformed expectations. The preponderance of the charge related to this product was attributable to components unique to this camera.

*****

We remain cautious when providing guidance for the third quarter of fiscal 2004. We anticipate sales in the range of 30 to $35 million and a net loss in the range of 3 to $4 million, or 10 to 14 cents per share, as compared to sales of $36.2 million and net income of $1.3 million, or 4 cents per diluted share last year. Keep in mind, last year's third quarter was positively impacted by a $2 million net after-tax benefit related to the favorable resolution of a dispute, $300,000 of foreign exchange gains, and a more favorable product mix -- which included higher margin products, which had a positive effect on manufacturing efficiencies. Excluding these items, last year's third quarter net loss was $1 million, or 2 cents per share. Our guidance does not consider any potential impact resulting from non-cash variable stock option expense or income... We will continue to provide quarter by quarter guidance until economic and market conditions dictate otherwise.

27.     During the conference call, the issue of inventory was addressed as follows:

IKE GALLO: Ira, are you comfortable with the inventory position where it is today? Even with the write-off of I think around $3 million in the quarter of obsolete inventory, it was basically flat, I guess down slightly from where it was in the third quarter. And you're headed into, obviously, your typically seasonally softest sales period of the year. How comfortable are you that the inventory position is okay so that we can expect not to see any further write-downs in inventory?

IRA LAMPERT: Let me answer the question by providing information and then I will comment on my level of comfort. Number one, the inventory contains a lot of components, and a reason the inventory contains a lot of components -- and probably more so than ordinarily -- is because of what we believe is a lot of demand for components that come from very limited amounts of -- limited supply base. By way of example, sensors and optical components. So as a consequence, we probably have components that we have bought that would be out of our normal supply chain cycle so as to meet our demands that we see by forecast. That is number one.

Number two, obviously, our inventories are a little higher than we would have expected because sales attainment in the second quarter was not what we anticipated. Having said that, we addressed the issue with the one particular product, and mostly in components, that we thought was a subject of some problems. And we just took a charge and wrote it down. We did not hesitate. And therefore, we dealt with the problem and issue at hand. That is number one and number two.

Number three, we are reasonably comfortable with our inventories. And one thing we do with our inventories here is we review them very carefully against what we anticipate to be our forecast on our demands in ensuing quarters. Having said that, would I be in a more comfortable position if our inventories were at a smaller quantum? The answer is yes. Because inventory (indiscernible) it would dictate, at least in our industry, that we would want our turns to be somewhere in the 4 to 6 times a range which we have historically achieved. So yes, the answer to the question is we are a little long on our inventories; and further yes, we are comfortable. But having said that, we would have liked to have had our inventories at a somewhat lower level.

28.     On February 10, 2004, the Company filed its Form 10-Q for the quarterly period ended December 27, 2003 with the SEC ("the December 27, 2003 Form 10-Q"). This quarterly report, signed by defendant Finkbeiner, reflected substantially the same financial information presented in the February 5, 2004 press release.

29.     The February 5, 2004 press release, the December 27, 2003 Form 10-Q and the comments made during the conference call were materially false and misleading because they failed to disclose that the total of the Company's excess, obsolete and otherwise impaired inventory had exceeded $12 million as of August 14, 2003, that only approximately half of this total had been effectively written off against earnings (a portion through a change in the method of accounting for inventory), and that the remaining sum would be written off against earnings in the following quarter.

30.     Defendants Lampert and Finkbeiner each falsely signed certifications stating that the December 27, 2003 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of

-10-

the Securities Exchange Act of 1934" and that the "information contained in the Report fairly

presents, in all material respects, the financial condition and results of operations of the Company."

## THE TRUTH EMERGES

31.     On May 11, 2004, before the opening of trading, Concord issued a press release

announcing "that it will file Form 12b-25 with the Securities and Exchange Commission extending

the Company's time to file a Form 10-Q for the period ended March 27, 2004" because "recent price

declines in the digital camera market have negatively impacted the net realizable value of digital

camera inventories and, in response to market conditions, the Company is re-evaluating its estimates

for sales returns and allowances and the realizability of its deferred tax assets."  The press release

also reported that:

> The Company's estimated net sales for the quarter ended March 27, 2004 ("Third
> Quarter Fiscal 2004") were in the range of $26 million to $28 million, which
> represents a decrease of $8 million to $10 million as compared to net sales of $36
> million for the quarter ended March 29, 2003 ("Third Quarter Fiscal 2003"). The
> decrease in net sales was primarily due to pricing pressures for digital cameras, lower
> unit sales for all products and increases in estimated sales returns and allowances.
>
> The Company's net loss for Third Quarter Fiscal 2004 is expected to be in the range
> of $19 million to $20 million, as compared to net income of $1 million for Third
> Quarter Fiscal 2003. The estimated net loss in Third Quarter Fiscal 2004 reflects the
> impact of significant inventory provisions estimated to be in the range of $6 million
> to $7 million in response to pricing reductions by the Company's competitors and
> excess inventory levels at its customers. In addition, the loss also includes
> unfavorable production variances due to lower than expected production volumes and
> manufacturing inefficiencies. The net loss also includes the impact of establishing a
> valuation allowance against the Company's deferred tax assets estimated to be in the
> range of $8 million to $9   million. These charges in Third Quarter Fiscal 2004 were
> offset by variable stock-based compensation income of approximately $4
> million...Concord had previously provided guidance for the third quarter of net sales
> in the range of $30 to $35 million and a net loss in the range of $3.0 to $4.0 million,
> or $(0.10) to $(0.14) per share, before any variable stock option expense or income.

32.     Upon the release of this information, the price of the Company's stock priced dropped once again in inordinate trading volume. The Company's stock price dropped from its close on May 10, 2004 of $4.62 to a close of $3.04 on May 11, 2004 on volume of 3.3 million shares, well above Concord's average trading volume.

33.     GAAP (ARB 43 Chapter 4, Statement 3) provides that: "The primary basis of accounting for inventories is cost." GAAP (ARB 43 Chapter 4, Statement 5) also provides that:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as the cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

34.     During the Class Period, defendants issued financial statements which falsely represented compliance with this GAAP, stating: "Inventories, consisting of raw materials, work-in-process and finished goods, are stated at the lower of cost or market value and are determined on a first-in, first-out basis."

35.     On July 27, 2004, CFO Finkbeiner resigned.

36.     Effective August 2, 2004, Donald Dawn became Concord's new CFO.

37.     On Saturday, August 27, 2004, Donald Dawn resigned as Concord's CFO. Dawn had 27 years of accounting experience before taking the position with Concord.

## UNDISCLOSED ADVERSE INFORMATION

38.     The market for Concord common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Concord common stock traded at artificially inflated prices during the Class Period. The

-12-

artificial inflation continued until the time Concord admitted that it was experiencing declining sales and these admissions were communicated to, and/or digested by, the securities markets. Plaintiff and other members of the Class purchased or otherwise acquired Concord common stock relying upon the integrity of the market price of Concord common stock and market information relating to Concord, and have been damaged thereby.

39.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Concord common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

40.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Concord's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Concord and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

41.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Concord and its business practices, their control over and/or receipt of Concord's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Concord were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

42.    Defendants engaged in such a scheme to inflate the price of Concord common stock in order to: (i) protect and enhance their executive positions; (ii) artificially enhance the price of Concord stock; (iii) sell their personal holdings of Concord stock at artificially inflated prices and (iv) maximize their performance-based bonuses.

43.    Defendants either knew and ignored, or were reckless in not knowing, that the proceeds, if any, from the disposal of the Company's excess and obsolete inventory of customized

-14-

higher-cost specialty component items, which had been acquired to manufacture specific digital cameras for sale to specific customers, had no alternative use and were non-salable at a price which would enable recovery of its cost. Defendants, in contravention of GAAP, deferred the recognition of a $12 million inventory write-down during the Class Period.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased the common stock of Concord between August 14, 2003 and May 10, 2004, inclusive (the "Class Period"). Excluded from the Class are the defendants herein, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

45.     Because Concord has millions of shares of common stock outstanding, and because the Company's common stock was actively traded, on the NASDAQ National Markets, members of the Class are so numerous that joinder of all members is impracticable. As of May 2004, Concord had 28.45  million shares outstanding. While the exact number of Class members can only be determined by appropriate discovery, plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

46.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiff and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class plaintiff seeks to represent.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

49.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

b.     whether the Company's publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c.     whether defendants participated in and pursued the fraudulent scheme or course of business complained of;

-16-

d.      whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

e.      whether the market prices of Concord common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## STATUTORY SAFE HARBOR

50.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.  Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Concord who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

51.     At all relevant times, the market for Concord common stock was an efficient market for the following reasons, among others:

(a)     Concord common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient market;

(b)     As a regulated issuer, Concord filed periodic public reports with the SEC and the NASD;

(c)     Concord stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(d)     Concord regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

52.     As a result, the market for Concord securities promptly digested current information with respect to Concord from all publicly-available sources and reflected such information in Concord's stock price.  Under these circumstances, all purchasers of Concord common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

-18-

## COUNT I

### For Violations Of Section 10(b) Of The
### 1934 Act And Rule 10b-5 Promulgated
### Thereunder Against All Defendants

53.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth

herein.  This claim is asserted against defendants Concord, Lampert, Press and Finkbeiner.

54.     During the Class Period, Concord, Lampert, Press and Finkebeiner, and each of them,

carried out a plan, scheme and course of conduct which was intended to and, throughout the Class

Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged

herein; (ii) artificially inflate and maintain the market price of Concord common stock; and (iii)

cause plaintiff and other members of the Class to purchase Concord stock at artificially inflated

prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants Concord and

the Individual Defendants, and each of them, took the actions set forth herein.

55.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices and a course of business which operated

as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain

artificially high market prices for Concord common stock in violation of Section 10(b) of the

Exchange Act and Rule 10b-5.  These defendants are sued as primary participants in the wrongful

and illegal conduct charged herein.  These defendants are also sued herein as controlling persons of

Concord, as alleged below.

56.     In addition to the duties of full disclosure imposed on defendants as a result of their

making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

57.    Concord, Lampert, Press and Finkbeiner, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Concord as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Concord's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Concord and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Concord securities during the Class Period.

58.    Lampert's, Press' and Finkbeiner's primary liability, and controlling person liability, arise from the following facts: (i) Lampert, Press and Finkbeiner were all high-level executives

and/or directors at the Company during the Class Period; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

59.     These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Concord's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Concord's common stock

was artificially inflated during the Class Period. In ignorance of the fact that the market price of Concord's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Concord common stock during the Class Period at artificially inflated high prices and were damaged thereby.

61. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Concord, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Concord securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62. By virtue of the foregoing, Concord, Lampert and Press each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The
### 1934 Act Against Lampert, Press and Finkbeiner

64.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against Lampert, Press and Finkbeiner.

65.     Lampert, Press and Finkbeiner were and acted as controlling persons of Concord within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Lampert, Press and Finkbeiner had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Lampert, Press and Finkbeiner were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In addition, Lampert, Press and Finkbeiner had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Concord, Lampert, Press and Finkbeiner each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

controlling positions, Lampert, Press and Finkbeiner are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)    Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 1, 2004

                                        **VIANALE & VIANALE LLP**

By: _____
                  Kenneth J. Vianale
                  Fla. Bar No. 0169668
                  Julie Prag Vianale
                  Fla. Bar No. 0184977
5355 Town Center Road, Suite 801
Boca Raton, FL  33486
Tel: (561) 391-4900
Fax: (561) 368-9274

**BERGER & MONTAGUE P.C.**
Sherrie R. Savett
Robin Switzenbaum
1622 Locust Street
Philadelphia, PA 19103
Tel:    215-875-3000
Fax:    215-875-4604

**LAW OFFICES OF CURTIS V. TRINKO**
Curtis V. Trinko
16 West 46th Street
7th Floor
New York, NY 10036
Tel:    (212) 490-9550
Fax:    (212) 986-0158

**Attorneys for Plaintiff**

-25-

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

**I, MARTIN BRUSTEIN,** hereby certify as follows:

1.      I have reviewed the complaint prepared for me concerning Concord Camera Corp., brought under the federal securities laws, and have authorized the filing of such an action.

2.      Plaintiff did not purchase, or otherwise acquire, the securities of Concord Camera Corp., that are the subject of this action, at the direction of plaintiff's counsel, or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, and will provide testimony at a deposition and/or at trial, if necessary.

4.      Plaintiff's transactions in the securities that are the subject of this litigation during the class period set forth in the complaint are, as follows:

a).      Plaintiff purchased 1,000 shares of Concord Camera Corp. common stock on November 6, 2003 at $ 10.325 per share;

b).      Plaintiff still holds these shares;

c).      Plaintiff sold 20 Puts (February $ 12 1/2's) on November 6, 2003 at $2.90 per share;

d).      Plaintiff bought back these above-noted 20 Puts on February 5, 2004 at $ 6.40 per share

e).      Plaintiff sold 20 Puts (February $ 12 1/2's) on December 9, 2003 at $ 1.70 per share; and

f).      Plaintiff bought back these above-noted 20 Puts on February 17, 2004 at $ 6.30 per share.

5.        During the three years prior to the date hereof, plaintiff has not filed an action in which he has sought to serve, or has served, as a representative party for a class in any action filed under the federal securities laws.

6.        Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond his pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed this __17__ day of June, 2004 at Great Neck, New York.


**MARTIN BRUSTEIN**

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required fir the use by the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.  (a)  PLAINTIFFS**

MARTIN BRUSTEIN, individually and on behalf of all others similarly situated

**04 - 61159**

**DEFENDANTS**

IRA B. LAMPERT, HARLAN PRESS, RICHARD M. FINKBEINER and CONCORD CAMERA CORP.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Nassau, NY**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Vianale & Vianale LLP
5355 Town Center Road, Suite 801
Boca Raton, FL 33486
Tel: 561-391-4900

**CIV - LENARD**

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE
SIMONTON

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN, ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

O:04 CV 61159  Lenard/Simonton

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to district Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | B ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B ☐ 630 Liquor Laws | | B ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B ☐ 640 R R & Truck | | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B ☐ 650 Airline Regs | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B ☐ 660 Occupational Safety/Health | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B ☐ 690 Other | | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | **A PROPERTY RIGHTS** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 620 Copyrights | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐ 830 Patent | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 893 Environmental Matters |
| B ☐ 210 Land Condemnation | ☐ 441 Voting | B ☐ 510 Motions to Vacate Sentence | ☐ 720 Labor/Mgmt Relations | **B SOCIAL SECURITY** | ☐ 894 Energy Allocation Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 861 HIZ (1395ff) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B ☐ 540 Mandamus & Other | A ☐ 791 Empl Ret Inc Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B ☐ 550 Civil Rights | | ☐ 865 RSI (405(g)) | |
| | | B ☐ 555 Prison Condition | **FEDERAL TAX SUITS** | | |
| | | | A ☐ 870 Taxes (U S Plaintiff or Defendant | | |
| | | | A ☐ 871 IRS – Third Party 26 USC 7609 | | |

**VI. CAUSE OF ACTION** (CITE THE U.S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

15 U.S.C. Sections 78j(b) and 78t(a)

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

**VIII. RELATED CASE(S) (See instructions):**
IF ANY    JUDGE _____    DOCKET NUMBER _____

DATE
September 1, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 531865   AMOUNT 150.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____