**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 04-61159-CIV-LENARD/TORRES**

---

STEPHEN J. MAZUR, individually and          :
on behalf of all others similarly situated,   :
                                              :
                       Plaintiff,             :
                                              :
vs.                                           :
                                              :
IRA B. LAMPERT, HARLAN PRESS,                 :
RICHARD FINKBEINER, BRIAN F. KING:
and CONCORD CAMERA CORP.,                     :
                                              :
                       Defendants.            :
_____:

**DECLARATION OF ROBIN SWITZENBAUM IN SUPPORT OF FINAL**
**APPROVAL OF THE SETTLEMENT, LEAD COUNSEL'S REQUEST**
**FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES,**
**AND AWARD TO LEAD PLAINTIFF**

I, Robin Switzenbaum, declare and state, under penalty of perjury, that the following is true

and correct to the best of my knowledge, information and belief:

1.      I am a shareholder of Berger & Montague, P.C. ("Berger & Montague").  By Order

dated July 19, 2005, the Court appointed Berger & Montague to serve as lead counsel for the Class

("Lead Counsel") and Vianale and Vianale, LLP ("Vianale & Vianale") to serve as liaison counsel

for the class ("Liaison Counsel") (together, "Plaintiffs' Counsel") in the above-captioned action (the

"Action").[1]  As Lead Counsel, Berger & Montague directed the litigation of this Action on behalf

---

[1]  Defendants in this Action are Concord Camera Corp. ("Concord" or the "Company"), Ira
B. Lampert ("Lampert"), Richard Finkbeiner ("Finkbeiner"),  Brian F. King ("King") and Harlan

of all purchasers of the common stock of Concord between August 14, 2003 and August 31, 2004 (the "Class"). I have personal knowledge of the matters described below and am competent to testify thereto.

2.     I make this Declaration, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, on behalf of lead plaintiff Stephen Mazur ("Lead Plaintiff" or "Plaintiff") in support of (a) Motion for Final Approval of Class Action Settlement and Plan of Allocation and (b) Motion by Lead Plaintiff for an Award of Attorneys' Fees and Reimbursement of Expenses and an Award to Lead Plaintiff. This Declaration provides information about the Action, the settlement and the services performed by Lead Plaintiff and Plaintiffs' Counsel that resulted in the settlement.

3.     The settlement submitted to the Court for approval represents an outstanding result in a challenging case. As set forth in greater detail below, the settlement provides for a cash payment in the total amount of $2,000,000, plus interest (the "Settlement" or the "Settlement Fund"), to compensate members of the Class. From the Settlement Fund, Lead Counsel is seeking this Court's approval to pay attorneys' fees, reimburse expenses and provide for an award to Lead Plaintiff for his representation of the Class, along with the approval of a plan of allocation of the Settlement Fund (the "Plan of Allocation"). Considering the risks of litigation, this Settlement is an excellent result for the Class.

4.     The Settlement was achieved only through the vigorous prosecution of plaintiffs' claims by Plaintiffs' Counsel and the assistance of a skilled mediator, former United States District Judge Nicholas H. Politan. By the time of the mediation on August 8, 2006, merits discovery was

---

Press ("Press") (collectively, "Defendants"). Defendants Lampert, Finkbeiner, King and Press are collectively referred to as the "Individual Defendants."

completed. Thus, Lead Plaintiff and Lead Counsel were fully aware of all of the strengths and weaknesses of the case and were preparing for trial when the parties reached the Settlement.

5.      Specifically, as detailed herein, (1) Plaintiffs' Counsel conducted an extensive investigation of the relevant facts and law; (2) the parties served and responded to comprehensive documents requests; (3) Lead Counsel subpoenaed forty-two third-parties for documents (including Concord's independent auditor Ernst & Young, LLP ("E&Y"), Concord's business consultant LEK Consulting, LLC, Concord's customers and warehouse provider, and investment analysts who covered Concord during the Class Period) and reviewed and analyzed the hundreds of thousand of pages of documents produced by Defendants and these third-parties; (4) the parties took sixteen (16) depositions (including depositions conducted by Plaintiffs' Counsel of the individual defendants and former employees of Concord, two E&Y auditors involved in auditing Concord's financial statements before and during the Class Period, an analyst of Concord, and depositions conducted by Defendants' counsel of Lead Plaintiff and confidential witnesses); (5) Lead Counsel moved for class certification which although granted was strenuously opposed by Defendants' counsel; (6) the parties filed and opposed numerous discovery motions, including motions to exceed the deposition limit, motions for protection regarding answering interrogatories and subpoena to third-party E&Y, and Defendants demand for the disclosure of Lead Plaintiff's confidential sources; (7) the parties served and responded to interrogatories and requests for admission; and (8) the parties consulted with experts on the camera business, inventory, accounting and damage assessment in preparation for trial.

6.      In addition, although Lead Plaintiff had obtained substantial evidence during discovery to support some of his claims and believed that it could prove some of his claims against

Defendants to a jury, the Settlement was reached after Plaintiffs' Counsel had a complete understanding not only of the strengths of its case, but also of the risks of proceeding to trial.  There was a risk that plaintiffs might not have prevailed on any or all of their claims and there was a significant risk that the decline in the price of Concord common stock could be attributed, in whole or in part, to other factors unrelated to the claims.  Furthermore, Defendants were represented by a series of two highly experienced and tenacious defense firms, Squire, Sanders and Dempsey LLP ("Defendants' initial counsel") and Greenberg Traurig, LLP (collectively, "Defendants' Counsel"), who took different tactics in defending the case.  Defendants' initial counsel had stubbornly refused to produce responsive documents and had engaged in a defense based on constant postponements and delays.  Replacement counsel, in contrast, produced numerous responsive documents containing detailed inventory analysis that took extensive man-hours to analyze.  By the time settlement was reached, Plaintiffs' Counsel had litigated the Action for nearly three years, and had spent hundreds of thousands of hours on discovery, with no assurance that they would win a judgment at trial, and the prospect that, even if they won, Defendants would appeal, further delaying recovery for the Class.  Moreover, even if plaintiffs won, there was no assurance that the Class would obtain damages beyond the amount of the Settlement.

7.    For the reasons discussed below, the proposed Settlement is fair, reasonable, adequate and in the best interests of the Class.  Because the proposed Settlement readily satisfies all relevant legal standards for approval of class action settlements, it should be approved.

8.    In addition, the petition for attorneys' fees in the amount of $600,000, plus interest, representing 30% of the Settlement Fund, represents a fair and reasonable percentage of the recovery obtained and should be granted by the Court.  As fully set forth in Lead Plaintiff's Memorandum of

Law in Support of his Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff (the "Fee Memorandum"), the percentage fee requested by Plaintiffs' Counsel results in a fractional multiplier that falls well below the range of fees awarded in similar class actions. Likewise, reimbursement of the total litigation expenses of $240,785.13 and the requested award to Lead Plaintiff are also fair and reasonable and should be approved.

9.     The requested fee in this case not only represents a reasonable percentage of the benefit obtained, but also reasonably reflects the extensive work completed by Plaintiffs' Counsel, especially in light of the fact that Lead Counsel and Liaison Counsel were the only law firms prosecuting the Action and bearing all of the risks in the case.  The services performed by Plaintiffs' Counsel resulted in a lodestar of over $1.8 million.  The requested fee of $600,000, plus interest, thus, is a tremendous discount on counsels' normal hourly rates.  As set forth in the accompanying Fee Memorandum, this negative multiplier falls well below the range of multipliers approved by courts in the Eleventh Circuit and reflects that Plaintiffs' Counsel will never be compensated for over two-thirds of their lodestar.

10.     In compliance with the Court's April 11, 2008 Preliminary Approval Order, as of May 19, 2008, Administar Services Group, LLC ("Claims Administrator") disseminated a total of 6,479 copies of notices of proposed settlement of class action (the "Notice of Settlement") to potential members of the Class, along with a proof of claim form ("Proof of Claim Form"), and caused a summary notice of proposed settlement of class action to be published in the national edition of *Investor's Business Daily* on two consecutive days, April 28, 2008 and April 29, 2008 ("Summary Notice").  *See* attached hereto as Exhibit A, Affidavit of David C. Skinner Regarding Dissemination of Notice to the Class (the "Skinner Affidavit"), ¶¶ 9-10. The requested fee is consistent with the

5

percentage described in the Notice of Settlement sent to all potential members of the Class.  Notably, although 6,749 copies of the Notice of Settlement and Proof of Claim form were mailed to potential members of the Class, as of May 19, 2008, there have been no objections to the Settlement, the Plan of Allocation, Plaintiffs' Counsel's requested fees and reimbursement of expenses or the requested award for Lead Plaintiff's representation of the Class.

11.     Lastly, the Settlement and requested attorneys' fees have been negotiated with and endorsed by Lead Plaintiff Stephen Mazur, an experienced business professional who has firsthand knowledge of the strengths and weaknesses of the claims, including the risks of litigation and the chances of obtaining a recovery larger than the Settlement in light of the risks associated with a trial, as a result of his consultation with counsel and attendance at mediation.

12.     In light of the foregoing, the proposed Settlement is an outstanding result worthy of final approval by the Court, and that the requested fee and expense award and the award to Lead Plaintiff, should be granted, as more fully explained in Lead Plaintiff's Memorandum of Law in Support of his Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Fee Memorandum.

## I.     BACKGROUND AND HISTORY OF THE LITIGATION

### A.     History of the Proceedings

13.     Concord is a company that, during the Class Period, designed, developed, manufactured and marketed single use cameras, traditional cameras and digital cameras on a worldwide basis.

14.     The Action was commenced on September 1, 2004 by the filing of a complaint in the Southern District of Florida captioned *Martin Brustein v. Ira B. Lampert, et al.,* C.A. No. 04-61159-

CIV-JAL. Additional complaints were filed thereafter in the Southern District of Florida captioned: *Chalermchai Punya, et al. v. Ira B. Lampert, et al.*, C.A. No. 04-61225-CIV-JAL; *Morris Ackerman, et al. v. Ira B. Lampert, et al.*, C.A. No. 04-61265-CIV-JAL; *Ricardo Bettencourt da Camera Teixera, et al.*, C.A. No. 04-61307-CIV-JAL/AMS; *John H. Abbott v. Ira B. Lampert, et al.,* C.A. No. 04-61351-CIV-JAL/AMS; and *Stephen J. Mazur v. Ira B. Lampert, et al.*, C.A. No. 04-22892-CIV.

15. By Orders of the Honorable Joan A. Lenard dated October 13, 2004, October 27, 2004, November 24, 2004 and December 14, 2004, all of the filed cases were consolidated under the lowest case number.

16. On May 10, 2005, by Order of the Court, the related derivative action filed, *Paul J. Nieman v. Ira B.Lampert et al.*, case number 05-60574-CV-JAL, was consolidated with this action for discovery purposes only.

17. By Order dated June 15, 2005, the Court appointed Stephen J. Mazur as Lead Plaintiff and by Order dated July 19, 2005, the Court approved Lead Plaintiff's selection of Berger & Montague, P.C. as Lead Counsel and Vianale & Vianale, LLP as Liaison Counsel for the Class.

**B.    Consolidated Complaint and Defendants' Answer**

18. The Consolidated Amended Class Action Complaint was filed on August 31, 2005 by Lead Plaintiff (the "Complaint"), superseding all prior complaints filed in the Action and alleging claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq. The Complaint alleged a Class that included all purchasers

of Concord stock between August 14, 2003, 2003 and August 30, 2004. Defendants named in the Complaint were Concord, Ira B. Lampert, Harlan Press, Richard Finkbeiner, and Brian F. King.

19.    In the Complaint, Lead Plaintiff alleged that Defendants knowingly disseminated materially false and misleading information in its public filings, as well as related press releases and during investor conference calls about (1) Concord's existing and future revenues from Kodak; (2) the profitability of the digital camera segment of its business; (3) the valuation of its inventory; (4) its internal controls including regarding revenue recognition and returns; and (5) the employment status of Brian F. King, a key player in the Concord management team.  The Complaint also claimed that certain of the Individual Defendants also issued false and misleading certificates of compliance with the Sarbanes-Oxley Act.  Specifically, the Complaint alleged that beginning on August 14, 2003 with the announcement of Concord's fiscal 2003 results, Defendants campaigned to falsely persuade investors that Concord was successful not only in its entry into the riskier digital camera retail market, but that sales of single use cameras under its far less risky original equipment manufacture contracts with Kodak were rising.  Contrary to Concord's public disclosures, the Complaint alleged the reported assets and revenues in fiscal 2003 were overstated and the Company faced a myriad of problems, chiefly related to excess and obsolete inventory internal controls, its ability to produce more complex digital cameras in a timely and cost efficient manner and its choice to take on one of its most important customers, Kodak, as a competitor, which it knew would adversely affect its ability to meet its optimistic projections.  Unbeknownst to the market, Kodak, a provider of a large percentage of the Company's sales, had indicated it would lower its demand for Concord single use cameras.  Kodak would eventually stop purchasing cameras from Concord under two original equipment manufacturer contracts as Defendants disclosed on October 1, 2004, shortly after the end

of the Class Period.  The Complaint further alleged that Defendants concealed these facts, and made partially corrective disclosures in part, to manage earnings on November 6, 2003, January 16, 2004, February 5, 2004, May 11, 2004 and August 31, 2004.  The Complaint alleged that upon the revelation of previously undisclosed material information during the Class Period, the price of Concord stock dropped from a high of $12.08 to $1.95 on August 30, 2004, thereby causing damages to Lead Plaintiff and the other members of the Class.

20.     Defendants chose not to file a motion to dismiss.  Instead, on December 2, 2005, Defendants filed an answer to the Complaint ("Answer"), denying all allegations of liability therein and asserting affirmative defenses thereto.

### C.     Merits Discovery

#### i.     *Preliminary Scheduling and Initial Disclosures*

21.     Pursuant to the Court's Order dated December 9, 2005, the parties met and conferred on January 9, 2006 regarding a scheduling order.  Unable to reach an agreement, Lead Plaintiff filed his proposed schedule on January 9, 2006 and Defendants filed its proposed scheduling order on January 10, 2006.  On February 3, 2006, the Court issued an Order setting the pretrial schedule ("Scheduling Order").  The Scheduling Order, *inter alia,* set trial for December 10, 2007, called for all fact discovery to be completed by January 31, 2007, and for all expert discovery to be completed by June 29, 2007.

22.     In accordance with Federal Rule of Civil Procedure 26(a)(1), Lead Plaintiff served his initial disclosures on February 16, 2006.  Following the threat of a motion to compel by Lead Plaintiff, Defendants served its initial disclosures on April 19, 2006.

23.     Pursuant to the Court's Order dated February 3, 2006 and  following discussion and negotiation between the parties on the selection of an appropriate mediator, on March 2, 2006, the parties filed  a proposed order scheduling a mediation in this case before retired Judge Nicholas H. Politan on September 19, 2007.

ii.     *Company and Ernst & Young Documents*

24.     Numerous "meet and confer" telephone conferences were held by the parties from January 2006 through June 2007, and numerous letters and emails were exchanged between counsel through which the parties discussed the responses and objections to the parties' discovery requests and attempted to resolve disputed issues.  However, the parties were unable to agree on a number of discovery issues throughout the course of the litigation and plaintiffs were required to file motions and responses to motions in an attempt to obtain the documents and/or information they regarded as relevant and essential to win their case resulting in substantial motion practice.

25.     Lead Plaintiff served his initial document requests on the Company on February 16, 2006.  Document requests were also served on third-party E&Y, the Company's prior auditor, on February 16, 2006.

26.     Prior to the production of any documents, the parties negotiated and drafted a stipulated protective order governing the production and use of confidential materials (the "Confidentiality Order").  The Court approved the Confidentiality Order on May 8, 2006.

27.     On March 30, 2006, Defendants filed a motion under Fed. R. Civ. P. 26(c)(4) for the entry of a protective order seeking the narrowing of plaintiffs' subpoena issued to E&Y.  Defendants objected that the document requests to E&Y for audit work papers for the relevant time period, were overly broad and not relevant to plaintiffs' claims alleged in the Complaint.

10

28.     On April 17, 2006, plaintiffs filed a response to Defendants' motion as to the subpoena issued by plaintiffs to E&Y.  Plaintiffs argued that Defendants had not shown – or even argued – that they had good cause for obtaining a protective order under Rule 26(c).  Specifically, Defendants had not asserted that the subpoena issued to E&Y subjected E&Y to any of the difficulties justifying grounds for relief under Rule 26(c). In fact, E&Y has already agreed to, and was ready to, produce all relevant documents pursuant to the subpoena.  Plaintiffs further argued that Defendants' argument that the subpoena was overly broad was entirely incorrect, as the subpoena requested documents that were clearly relevant to plaintiffs' claims, and were well within the scope of permissible discovery under Rule 26.  E&Y's workpapers and other documents responsive to the subpoena directly related to plaintiffs' securities fraud claims – that Defendants issued reports and press releases containing false financial information which artificially inflated the price of Concord's stock. Further, the relevant time frame in the E&Y subpoena was limited and focused to only obtain discovery relevant to the claims at issue.

29.     On April 21, 2006, Defendants filed a reply to Lead Plaintiff's response to Defendants' motion for a protective order.

30.     On May 22, 2006, the Court's Order denied Defendants' motion for protective order as to the subpoena issued by plaintiffs to E&Y, holding Defendants have not met their burden of demonstrating good cause for entry of a protective order, holding that the information plaintiffs sought from E&Y was relevant to the claims alleged, and plaintiffs' subpoena was not overbroad.

31.     At the same time, Defendants' initial counsel requested, and were granted, numerous extensions with respect to the production of the Company's documents.  On March 23, 2006, Defendants' initial counsel requested an extension of the deadline for the first request for production

of documents until April 14, 2006.  Plaintiffs' Counsel granted the request for an extension.  On April 17, 2006, Defendants' initial counsel again requested and was granted an extension until April 24, 2006.  On May 1, 2006, the parties engaged in their first meet and confer regarding the Defendants' lack of document production.

32.    Following the threat of a motion to compel, Defendants served their responses and objections to plaintiffs' first requests for production of documents on May 19, 2006 and produced one and a half boxes of responsive documents.

33.    On July 21, 2006, Plaintiffs' Counsel sent a letter to Defendants' initial counsel regarding deficiencies in the production relating to the first document requests and sent plaintiffs' second request for production of documents directed to Defendants.

34.    The parties held a second meet and confer on August 1, 2006.  Following this meet and confer, on August 3, 2006, Defendants produced one and a half boxes of documents responsive to plaintiffs' first requests for production.

35.    Defendants' initial counsel then requested another extension for the production of documents on August 22, 2006.  Plaintiffs' Counsel granted an extension until September 8, 2006.

iii.    *Initial Depositions Scheduled and Defense Counsel Changed*

36.    In August 2006, mindful of the tight discovery schedule, plaintiffs began to notice depositions.  Plaintiffs' Counsel noticed the deposition of Donald Dawn, the former Concord Chief Financial Officer who had resigned only three weeks after beginning his employment, for August 21, 2006.  However, on August 1, 2006, Defendants' initial counsel requested that Dawn's deposition be postponed until after Labor Day weekend.  Accordingly, it was postponed to September 14, 2006.

12

37.     Having received the E&Y documents after the Defendants' motion for protective order was denied, on September 7, 2006,  Plaintiffs' Counsel noticed the depositions of John Preval and Yuka Fujiu, two E&Y auditors, for September 27, 2006 and September 28, 2007, respectively. On September 20, 2006, despite having agreed to the dates, Defendants' initial counsel requested plaintiffs postpone the depositions of E&Y auditors due to a pre-paid vacation by one of Defendants' initial counsel.  As a professional courtesy, Plaintiffs' Counsel postponed the two E&Y depositions.

38.     At the deposition of Donald Dawn on September 14, 2006, Defendants indicated that document discovery would now be expedited.  At this juncture also, Lead Counsel was informed that Defendants' initial counsel was being replaced.  Accordingly, on October 2, 2006, the Defendants filed a stipulation to substitute counsel which was granted by the Court on October 20, 2006.

39.     Defendants' new counsel immediately began producing documents.  On October 17, 2006, Defendants began a rolling production of documents and continued to produce documents through February 7, 2007, with the largest volume of those documents being produced from October 2006 to December 2006.  On December 28, 2006, plaintiffs served their third request for documents on Defendants.  In total, Defendants produced approximately 156,000 pages of documents in both hard copy format and on multiple compact discs.  These documents included inventory reports and spread sheets which were very complex in nature and required extensive review.

40.     On October 23, 2006, due to the change in Defendants' counsel and numerous open discovery issues, the parties requested an amendment of the scheduling order extending all deadlines by ninety days.  The Court approved this request on October 27, 2006.

41.     In addition to documents of Defendants and E&Y, during the course of discovery, Plaintiffs' Counsel reviewed documents subpoenaed from approximately forty-one (41) other

13

third-parties, including Concord's consultants KPMG LLC and LEK Consulting, Inc., several of Concord's customers, Concord's lender Hong Kong and Shanghai Banking Corporation Limited, Concord's warehouser Hellman Worldwide Logistics, Inc., and securities analysts who covered Concord during the Class Period.  More than a hundred thousand pages of documents were received from these third-parties.

iv.   <em>Initial Settlement Discussions and Depositions</em>

42.    Defendants' counsel asked Lead Counsel to have an initial discussion regarding settlement after Lead Counsel had the opportunity to review all the documents produced by Concord. Counsel for the parties met on January 30, 2007 in Miami, Florida.  While the allegations in the Complaint regarding the write-down of inventory to manage earnings were not supported by the documentary evidence, Lead Counsel did find documentary evidence to support allegations regarding Kodak.  The parties agreed these issues needed further investigation, and at this juncture, as described below, the parties were still far apart in their perceptions of the case.

43.    Due to open discovery issues related to Kodak, on February 15, 2007, the parties requested an amendment of the scheduling order to extend certain deadlines relating to fact and expert discovery only.  On April 18, 2007, the Court granted the parties request to extend the time to complete discovery, extending the fact discovery deadline to July 1, 2007 and the expert discovery deadline to October 10, 2007.

44.    Meanwhile, Plaintiffs' Counsel conducted the following depositions:

        a.    on December 14, 2007, Plaintiffs' Counsel deposed John Preval an E&Y auditor who audited Concord's financial statements during the Class Period;

14

b.  on December 20, 2007, Plaintiffs' Counsel deposed Paul Sisak, a former Concord employee who acted as a controller of Concord's Keystone division during the Class Period;

c.  on February 16, 2007, Plaintiffs' Counsel deposed Gary Steiner, an analyst at Awad Asset Management who covered Concord and issued analyst reports on Concord during the Class Period;

d.  on February 22, 2007, Plaintiffs' Counsel deposed Rodney King, a former Concord employee who acted as the Vice President of Sales for the Americas during the Class Period; and

e.  on March 6, 2007, Plaintiffs' Counsel deposed M.K. Myatt via telephone, who was the E&Y senior manager of the independent audit of Concord's financial statements during the Class Period.

45. In late February 2007 and early March 2007, Plaintiffs' Counsel noticed the depositions of the following: Gerald Angeli, Concord's Vice President of Worldwide Engineering; Joseph Leonardo, a Vice President of Concord; Bill Parish a former Concord employee; Blaine Robinson, a Concord Corporate Controller; Craig Smith, a former Concord employee; Urs Stampfli, a Concord Senior Vice President and Director of Global Sales and Marketing; and David Wand, a Concord Vice President of the Worldwide Supply Chain.   The depositions were subsequently canceled after Defendants' counsel refused to consent to exceeding the ten deposition limit imposed by the Federal Rules of Civil Procedure.

46. On February 28, 2007, plaintiffs filed an emergency motion to take in excess of ten depositions, which the Court denied the same day stating plaintiffs' motion was premature and that plaintiffs must exhaust all ten depositions before motioning the Court to exceed the limit.

47. Before revisiting the need to exceed the ten deposition limit, Plaintiffs' Counsel deposed the following key party and non-party witnesses, including the Individual Defendants:

15

    a.      on April 4, 2007, Plaintiffs' Counsel deposed Defendant Brian F. King, Concord's Senior Executive Vice President and Assistant Secretary during the Class Period;

    b.      on April 6, 2007, Plaintiffs' Counsel deposed Defendant Richard Finkbeiner, Concord's Chief Financial Officer and Senior Vice President during the Class Period;

    c.      on April 25, 2007, Plaintiffs' Counsel deposed Defendant Ira B. Lampert, Concord's President, Chief Executive Officer, and Chairman during the relevant time period; and

    d.      on May 11, 2007, Plaintiffs' Counsel deposed Keith Lampert, Concord's Chief Operating Officer and Ira Lampert's son during the relevant time period.

48.    To minimize costs and also not to exhaust the allotted depositions, instead of deposing witnesses, Lead Counsel interviewed and obtained signed affidavits from Joseph Leonardo, a former employee of Concord, and Steven Decker, an employee of Kodak who had business dealings with Concord during the Class Period.

49.    On May 15, 2007, after plaintiffs exhausted the ten depositions granted to them under the Federal Rules, they filed a motion to exceed the ten deposition limit in order to take the deposition of defendant Harlan Press.  Plaintiffs argued that the relative burden and expense was very small as compared to the factors set forth in Federal Rule of Civil Procedure 26(b)(2)(iii): "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

50.    Defendants' filed a response in opposition to Lead Plaintiff's motion to exceed the ten deposition limit in order to take the deposition of defendant Harlan Press on May 30, 2007, arguing (i) plaintiffs failed to make a particularized showing as to why the ten deposition limit needed to be exceeded in order to take the deposition of defendant Harlan Press, (ii) plaintiffs had

16

had ample time to depose Press, and (iii) the burden or expense of deposing defendant Harlan Press outweighed its likely benefit.

51.      On June 8, 2007, plaintiffs filed a reply in further support of their motion to exceed the ten deposition limit in order to take the deposition of defendant Harlan Press, showing that good cause existed to exceed the normal ten deposition limit in this case for the purpose of taking one additional deposition and the burden and expense to Defendants was minimal.

52.      On June 18, 2007, the Court granted plaintiffs' motion to take the deposition of defendant Harlan Press finding plaintiffs justified the necessity of each deposition previously taken and made a particularized showing as to why the additional deposition of defendant Press was necessary.  On July 11, 2007, Plaintiffs' Counsel deposed Defendant Harlan Press, Concord's Vice President, Treasurer, and Assistant Secretary who had sold some of his holdings during the period.

53.      On June 26, 2007, the parties filed a motion to further amend the Scheduling Order in order to delay the expert discovery until after the completion of the mediation.  On June 27, 2007, the Court granted in part and denied in part the motion to extend time.  Specifically, the Court extended the deadline for plaintiffs to submit their expert witness list and reports until September 15, 2007; the deadline for Defendants to submit their expert witness list and reports until September 20, 2007; and the deadline for completion of all expert discovery until October 20, 2007.  However, to preserve the trial date, the deadline for filing all dispositive pretrial motions and motions to exclude or limit proposed expert testimony remained November 10, 2007.

v.   *Plaintiffs' Interrogatories, Requests for Admissions and Certificates of Authentication*

54.     In addition to obtaining relevant factual information from document discovery and depositions in preparation for trial, plaintiffs served numerous interrogatories and requests for admission to streamline discovery.  Plaintiffs served three sets of interrogatories and two set of requests for admission on Defendants.  Plaintiffs served its first set of interrogatories on Defendants on January 23, 2007.

55.     On March 9, 2007, Defendants filed a motion for a protective order from answering interrogatories contained in Lead Plainitff's first set of interrogatories, specifically interrogatories numbered one through four.   Defendants argued that plaintiffs' first set of interrogatories were improper under Federal Rule of Civil Procedure 33(a) which limits to twenty-five the amount of interrogatories that may be propounded on a party.  Defendants' initial counsel argued that each interrogatory contained multiple sub-parts and each subpart should be considered an additional interrogatory.

56.     On March 26, 2007, plaintiffs filed a response to Defendants' motion for protective order from answering interrogatories contained in Lead Plaintiff's first set of interrogatories, arguing that its interrogatories requested common-themed details that were subsumed within the broader, numbered interrogatory, thus plaintiffs did not exceed the twenty-five interrogatory limit.  Plaintiffs furthered argued that Defendants failed to satisfy the meet and confer requirements before filing their motion for a protective order.

57.     On April 5, 2007, Defendants filed a reply in further support of its motion for protective order from answering interrogatories contained in Lead Plaintiff's first set of

18

interrogatories, alleging it satisfied the conference requirements before filing its motion for a protective order.

58.     On April 9, 2007, the Court denied Defendants' motion for protective order from answering interrogatories contained in plaintiffs' first set of interrogatories and ordered Defendants to answer plaintiffs' interrogatories numbered one through four.

59.     Between March 19, 2007 and April 18, 2007, plaintiffs served Defendants with two additional sets of interrogatories and two sets of requests for admissions, to which Defendants timely objected and responded.  Defendants served two sets of interrogatories on November 21, 2006 and March 6, 2007 to which plaintiffs timely responded.

60.     In preparation for trial, Plaintiffs' Counsel drafted and sent out certificates of authentication to ten third-parties between March 12, 2007 and May 2, 2007.

> vi.     *Defendants' Requests for Production of Documents and Interrogatories*

61.     On November 21, 2006, Defendants served their first request for production of documents on plaintiffs.  Plaintiffs served their responses and objections to numbers one through eight of Defendants' first request for production of documents on January 12, 2007 and responses and objections to numbers nine through seventy-one on January 29, 2007, and, thereafter, produced responsive documents to Defendants. Defendants served their second and third requests for production of documents on plaintiffs on March 16, 2007 and April 18, 2007, to which plaintiffs responded on April 16, 2007 and May 3, 2007, respectively.

62.     On November 21, 2006, Defendants served plaintiffs its first set of Interrogatories. plaintiffs responded to numbers 1-7 and 10-11 on January 29, 2007.  After a series of letters between

parties in March 2007, plaintiffs responded to numbers 8, 9A and 9B of Defendants' first set of interrogatories.

63.     On March 6, 2007, Defendants' sent plaintiffs its second set of interrogatories. Plaintiffs requested and were granted an extension to respond on April 16, 2007.  Plaintiffs submitted responses to Defendants' second set of interrogatories on April 16, 2007.

     vii. *Defendants' Motion to Compel the Disclosure of Confidential Witnesses*

64.     On February 23, 2007, Defendants filed a motion to compel Lead Plaintiff to disclose the identities of the confidential witnesses whom Lead Plaintiff relied upon to draft substantive allegations in the Complaint.  Defendants alleged that they sought disclosure of the identities so that they could depose them during the discovery period in order to prepare to meet their testimony and defend plaintiffs' allegations at trial.

65.     Lead Plaintiff filed a response in opposition to Defendants' motion to compel Lead Plaintiff to disclose the identities of the confidential witnesses on March 9, 2007 arguing the identities are routinely protected as a matter of fairness and public policy and protected by the attorney work-product doctrine.  Plaintiffs further argued Defendants failed to show any undue burden or inability to simply interview these witnesses – their own former employees – themselves.

66.     On March 19, 2007, Defendants filed a reply to Lead Plaintiff's response in opposition to Defendants' motion to compel Lead Plaintiff to disclose the identities of the confidential witnesses arguing that the work-product privilege did not apply, Defendants had shown "substantial need" and undue hardship, and plaintiffs had failed to establish that public policy precluded disclosure.

67.     The Court granted Defendants' motion to compel Lead Plaintiff to disclose the identities of the confidential witnesses on March 25, 2007, holding that the work product immunity, did not apply with respect to any "Confidential Witnesses" identified as such in the Complaint who are expected to be used, or relied upon, at trial.

68.     Defendants conducted the following depositions of witnesses who were identified by Plaintiffs' Counsel as potentially being relief on at trial:

a.      on April 26, 2007, Defendants' Counsel deposed Judy Chaze, a former Concord employee who worked as a customer service manager during the Class Period;

b.      on April 27, 2007, Defendants' Counsel deposed Bennet Pollack, a former Concord employee who worked as an accounts receivable accountant during the Class Period;

c.      on April 27, 2007, Defendants' Counsel deposed Elin Sellik, a former Concord employee who worked as an administrative assistant during the Class Period;

d.      on May 2, 2007, Defendants' Counsel deposed Martha Machado, a former Concord accounting consultant during the Class Period; and

e.      on June 4, 2007, Defendants' Counsel deposed John Sapio, a former Concord employee who worked as a supply chain manager during the Class Period.

**D.     Class Certification**

69.     On May 8, 2006, Lead Plaintiff filed a motion seeking an order certifying the Action as a class action under Fed. R. Civ. P. 23, attaching the affidavit of R. Alan Miller, an expert who opined as to Concord's efficient market during the Class Period.

70.     On May 23, 2006, the parties filed a joint motion to extend deadlines related to class certification.  Specifically, Defendants were given until June 12, 2006 to complete class action discovery and until July 5, 2006 to file a response to the class certification motion; and plaintiffs

21

were granted until August 4, 2006 to file a reply to Defendants' response.  The Court approved this request on May 24, 2006.

71.     On June 7, 2006, Defendants took the deposition of Lead Plaintiff Stephen Mazur for purposes of defeating class certification.

72.     On July 7, 2006, Defendants filed a memorandum on law in support of their opposition to Lead Plaintiff's motion for class certification.  Defendants opposed Lead Plaintiff's motion for class certification claiming the Lead Plaintiff's deposition testimony established that he could not satisfy the requirements of Federal Rule of Civil Procedure 23(a)(3)-(4) as his claims were not typical of absent class members because he was subject to unique defenses and he was not an adequate class representative.  Defendants also asserted that Lead Counsel was inadequate and should be sanctioned.

73.     On August 4, 2006, Lead Plaintiff filed a reply memorandum in further support of his motion for class certification, arguing, *inter alia,* that Lead Plaintiff was typical because he and the class members were pursuing claims based on common legal theories; Lead Plaintiff's personal impressions of Concord's partial negative disclosures do not make him subject to any unique defense; and Lead Plaintiff's purchases after the Class Period do not make him atypical.  Finally, Lead Plaintiff argued that Plaintiffs' Counsel did and would continue to provide the Class with adequate representation, that Defendants' counsel's claim for sanctions against Lead Counsel for advancing costs for Lead Plaintiff was within the ethical rules and that Lead Counsel had sufficient reasons to allege that defendant King was absent from the Company.

74.     On November 20, 2006 Lead Plaintiff filed a supplemental memorandum of law in further support of its motion for class certification attaching relevant documents from discovery

which supported contentions made in Lead Plaintiff's Complaint and motion for class certification, that defendant King was not at the Company after January 23, 2004, although his departure was not disclosed until May 11, 2004.

75.      By Order dated March 23, 2007, the Court (i) determined that the Action should be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the common stock of Concord during the period between August 14, 2003 and August 31, 2004, inclusive and were damaged as a result thereof; and (ii) appointed Stephen J. Mazur as class representative pursuant to Rule 23.

### E.      Mediation and Settlement Negotiations

76.      As noted above, in January 2007, after Plaintiffs' Counsel had undertaken its review of documents, counsel for the parties engaged in initial settlement discussions.  At that time, Plaintiffs' Counsel made an initial settlement demand of $9.5 million.  Defendants made no counter-offer in response, suggesting that plaintiffs proceed with discovery to more fully develop the issues regarding Kodak.  As the conclusion of fact discovery approached, Defendants' counsel suggested that the date of the previously scheduled mediation be advanced.

77.      Accordingly, the parties agreed to schedule a mediation after the completion of fact discovery and prior to commencing expert discovery.  The parties formally retained the Honorable Nicholas H. Politan, United States District Judge (retired), who had been previously selected as the mediator.  In preparation for the mediation, the parties prepared extensive mediation statements on liability and damages, as well as extensive compendia of supporting exhibits.

78.     On August 8, 2007, the parties participated in an intense one-day mediation session with Judge Politan in Florham Park, New Jersey.  Following this initial mediation session, the parties engaged in extensive telephone conversations with the mediator and reached this proposed Settlement on September 4, 2007.

79.     The Settlement negotiations between Plaintiffs' Counsel and counsel for the Defendants were conducted at  arms-length and in good faith.  The Settlement negotiations were difficult and intense, and initially the parties were very far apart.  Eventually, the parties reached an agreement as memorialized in the stipulation and agreement of settlement (the "Stipulation").  The parties worked diligently to draft the Stipulation, and signed the Stipulation on November 13, 2007.

80.     Lead Plaintiff not only attended the mediation but was kept apprised of all major developments in the Settlement negotiation process.  As described herein and in the accompanying Settlement Memorandum, the Settlement was the product of diligent efforts of the parties and their counsel.

## II.     DESCRIPTION OF THE SETTLEMENT

81.     Pursuant to the Stipulation dated November 13, 2007, thirty days after the Court preliminarily approval of the Settlement, Defendants were required to pay and have paid $2,000,000 to the Settlement Fund into an escrow account for the benefit of the Class.  The Settlement proceeds were deposited into the escrow account on May 15, 2008.

82.     The Stipulation, as well as the Notice sent to members of the Class, provides for a plan to allocate the Net Settlement Fund (the $2 million Settlement fund plus interest, less all taxes, Court-approved fees, expenses and award to Lead Plaintiff) to each member of the Class who submits a timely, valid and properly documented Proof of Claim form (the "Authorized Claimants").

24

This Plan of Allocation is described at length on pages 12-16 of the Notice and is summarized in Section III.D below.

## III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

83.    As discussed above, the Settlement was extensively litigated and negotiated at arm's length in an adversarial setting by experienced counsel who are fully familiar with all aspects of class action litigation. In reviewing a proposed settlement, the Court's role is to determine whether the settlement is fair, reasonable and adequate to all the parties.  Before entering into the Settlement, Plaintiffs' Counsel took into account, *inter alia*, the criteria for determining whether a settlement is fair, reasonable and adequate

### A.    The Settlement Was Reached in Good Faith

84.    The Settlement was only reached after extended arm's-length negotiations. Throughout the course of the settlement negotiations, all parties were represented by counsel with extensive experience in securities litigation in general, and in shareholder class actions in particular. Thus, the proposed Settlement was the result of an informed, expert, adversarial process which produced a fair compromise.

### B.    The Ultimate Likelihood of Success On The Merits Was Uncertain

85.    Substantial questions of law and fact placed the ultimate outcome of the litigation in doubt, thus supporting the conclusion that the Settlement is fair, reasonable and adequate to the Class.

86.    As discussed above, the Complaint alleged that Defendants knowingly disseminated materially false and misleading information about (1) Concord's existing and future revenues from

25

Kodak; (2) the profitability of the digital camera segment of its business; (3) the valuation of its inventory; (4) its internal controls including regarding revenue recognition and returns; and (5) the employment status of Brian F. King, a key player in the Concord management team. This required plaintiffs to demonstrate not only that the Complaint's statements were false and misleading, but that Defendants acted knowingly and/or recklessly in making those false statements. Plaintiffs faced considerable factual and legal difficulties meeting this very high standard.

87.    Initially, plaintiffs sought to find factual evidence to support their contention in the Complaint that inventory write-downs were improperly delayed to manage earnings. Such evidence did not materialize, although evidence supporting (i) Defendants' knowledge of Kodak's intended cancellations of its contracts, (ii) lack of internal controls, (iii) the departure of Brian King, and (iv) the inability of Concord to compete at profitable levels in the digital camera market were supported by substantial evidence.

88.    In using this factual evidence to prove liability, plaintiffs faced considerable challenges. Proving knowing and/or reckless conduct is in itself very challenging. Defendants denied any liability and would have presented evidence that (i) Defendants were uncertain as to whether Kodak would not provide other business to replace the probable cancellation of contracts; (ii) although E&Y criticized Concord's internal controls, they opined on the Company's financial statements; (iii) Brian King's departure was personal in nature and not business related; and (iv) the unprofitability of Concord's digital camera was not apparent until the end of the Class Period. Furthermore, there were a variety of claims that in combination were dramatic, but separately could have been attacked on whether they were individually material. Thus, a jury may not have found

liability.  Plaintiffs' Counsel considered that there was a substantial risk that plaintiffs might not have prevailed on any or all their claims.

89.     Further, there was a substantial risk that the decline in the price of Concord common stock could be attributed, in whole or in part, to other factors, apart from Defendants' misconduct. To prevail on a securities fraud claim, plaintiffs must connect the losses of the Class to the alleged fraud by proving "loss causation."  That is, plaintiffs must demonstrate that the loss was caused by a specific "corrective" disclosure which revealed the alleged fraud and that the stock price fell significantly as a result of the disclosure which revealed "the truth" to the market.  Defendants would argue in a summary judgment motion or at trial that plaintiffs could not point to any such disclosure during the Class period, as the price of Concord stock had fallen for other reasons by the time of the disclosure regarding Kodak, internal controls, and Concord's lack of profitability in its digital camera business.

90.     Even if the plaintiffs overcame these challenges, defeated a motion for summary judgment and won at trial, Defendants may have had very limited resources by this time to actually pay a judgment.  Indeed, the applicable $10 million insurance policy may have been severely exhausted by costs of defense, the Company's stock was already trading at very low levels, and there may have been no other deep pocket from which to collect as the net worth of defendant Lampert was and is tied up in his ownership of the Company's stock.

91.     In light of these risks, Lead Plaintiff opted for the immediate benefit to shareholders rather than a loss at trial or a judgment without any recovery.  If a settlement had not been reached at this stage, the case would have gone through costly discovery, possible summary judgment, an unpredictable trial and inevitable appeals, including the possibility of multiple interlocutory appeals.

### C. The Judgment of Plaintiffs' Counsel that the Settlement is Fair and Reasonable Provides Additional Support for the Approval of the Settlement

92.     Plaintiffs' Counsel have taken into account all of the above risks to arrive at a determination that the Settlement is fair and reasonable.  As outlined above, the Settlement was the product of arm's-length negotiations between experienced counsel who are very knowledgeable concerning shareholder class action litigation.

93.     Plaintiffs' Counsel strongly believe that the Settlement represents the best possible resolution of this litigation under the circumstances.  For the reasons set forth above, Plaintiffs' Counsel  believes the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

### D. The Plan of Allocation is Fair and Reasonable

94.     The Plan of Allocation, fully described in the Notice, was formulated by Lead Counsel to ensure its fairness and reliability.  Pursuant to the Preliminary Order and as set forth in the Notice, all Class members who wish to participate in the distribution of the net Settlement Fund must submit a completed proof of claim form.  As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, and attorneys' fees and expenses, the remaining Settlement Fund shall be distributed according to the Plan of Allocation.

95.     Lead Counsel formulated the Plan of Allocation after consulting with a damages expert in order to calculate a fair method to divide the net Settlement Fund for distribution among Class members.  Among other things, the Plan of Allocation requires that a qualified claimant's purchases of Concord stock occur on or after the first day of the Class Period and prior to the disclosure of fully curative information to Lead Plaintiff and other members of the Class.  In

28

addition, the calculation of recognized losses is adjusted according to when purchases where made during the Class Period and when, if ever, any sales were made during the Class Period.  This process ensures that only those investors who suffered financial losses fairly traceable to the alleged frauds will be allocated a pro rata share of the net Settlement Fund.  Moreover, it is notable that, as of May 19, 2008,  no Class members have objected to the Plan of Allocation.   Therefore, the proposed Plan of Allocation is fair and reasonable.

       **E.**    **Support of the Class**

96.     It is notable that despite over 6,479 Notices being sent to Class members, as of May 19, 2008, no objections have been filed

## IV.   PETITION FOR ATTORNEYS FEES AND LITIGATION EXPENSES

97.     The Stipulation of Settlement and Notice to the Class provides that plaintiffs may request that their attorneys' fees be paid from the Settlement Fund in an amount not more than 30% (or $600,000, plus interest) of the Settlement Fund. The Notice also indicated that plaintiffs would seek reimbursement of Plaintiffs' Counsel expenses in an amount not to exceed $250,000, and for an award of $40,000 to the Lead Plaintiff.

98.     In support of its application, Plaintiffs' Counsel  has submitted declarations summarizing the amount of time expended, the current hourly rates of the attorneys and paralegals who performed the services, the aggregate lodestars of the petitioning firms, and the expenses which those firms incurred.  Those declarations are attached as Exhibit B.

99.     A complete tabulation of each firm's hours and lodestar based on the separate records and declarations of each firm, is as follows:

| Law Firm | Hours | Lodestar |
|---|---|---|
| Berger & Montague P.C. | 5,351.25 | $1,865,881.25 |
| Vianale & Vianale LLP | 236 | $132,600.00 |
| **TOTAL** | 5,587.25 | $1,998,481.25 |

100.    Plaintiffs' Counsel made great efforts to work efficiently and prevent any duplication of work. Throughout the litigation, Plaintiffs' Counsel conferred regularly about the distribution of work and assigned tasks accordingly.

**A.    The Amount Requested for Attorneys' Fees Is Fair And Reasonable**

101.    The amount of attorneys' fees sought by Lead Counsel and Liaison Counsel is fair and reasonable.

102.    First, the requested fee is in line with similar fee awards.  Indeed, courts in similar securities fraud class action settlements regularly award fees as a percentage of the fund, and often as high as a third of the fund. Here, Plaintiffs' Counsel  has sought 30%, an amount well within the range of percentages used by other courts.

103.    Second, the fee request is fair and reasonable for a separate reason. Using the lodestar/multiplier approach the requested fee represents a discount in Plaintiffs' Counsel's total lodestar, a figure well within the range of multiplies that other courts have found reasonable.

**B.    Standing and Expertise of Plaintiffs' Counsel**

104.    Lead Counsel and Liaison Counsel are experienced practitioners in the field of class action securities litigation and have a long and successful track record in such cases. Moreover, the fact that our firms have demonstrated a willingness and ability to take complex cases such as this to

trial was undoubtedly a material factor that encouraged Defendants to engage in settlement discussions. Attached hereto at Exhibit B is a copy of each firm's resume.

### C.    Standing of Defendants' Counsel

105.    Defendants were represented at the time of Settlement by one of the country's most prestigious law firms, Greenberg Traurig, LLP. In the face of this formidable opposition, Plaintiffs' Counsel was nonetheless able to develop a case that was sufficiently strong that Plaintiffs' Counsel was able to convince Defendants to settle the case.

### D.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases

106.    This litigation was undertaken by Plaintiffs' Counsel entirely on a contingent-fee basis, meaning that we would be paid only if we recovered money for the Class and only a percentage of that recovery. From the outset, Plaintiffs' Counsel understood that they were embarking on a potentially complex, expensive and probably lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this litigation, and that funds were available to compensate staff and the considerable out-of-pocket costs which a case such as this entails.

107.    Because of the nature of a contingent-fee practice, where cases are often "big cases" lasting several years, not only do contingent-fee litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. The financial burden on contingent-fee counsel is thus far greater than on a firm that is paid on an ongoing basis.

31

108.     This does not even take into consideration the possibility of no recovery.   As discussed above, from the outset this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever. It is wrong to assume that a law firm handling complex contingent-fee litigation such as this always wins.  Tens of thousands of hours have been expended in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

109.     There are numerous cases where Plaintiffs' Counsel in contingent-fee cases, after the expenditure of thousands of hours, have received no compensation.  It is only the knowledge by defendants and their counsel that leading members of the plaintiff securities bar are actually prepared to, and will, force a resolution on the merits and go to trial, that permits meaningful settlements in actions such as this.  The losses suffered by Plaintiffs' Counsel in other actions where insubstantial settlement offers are rejected, and Plaintiffs' Counsel ultimately receive little or no fee, should not be ignored.

110.     Plaintiffs' Counsel  knows from personal experience that despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

111.     Plaintiffs' Counsel is all too familiar with many hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or an adverse-decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiff's bar have produced no fee for counsel.

112.     For example, in the *Koger* case, a securities class action went to trial and counsel won an $81 million jury verdict against an accounting firm after a 19-day trial in Jacksonville, Florida, only to have the verdict reversed on appeal on loss causation grounds and judgment entered for defendant. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997). Similarly, in the *Apple*

32

*Computer Securities* case, a substantial jury verdict was won against two of the defendants but then undone when the district court vacated the judgment on defendant's motion for judgment notwithstanding the verdict. *See In re Apple Sec. Litig.*, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH)  96,252 (N.D. Cal. Sept. 6, 1991).

113.   Just recently, a securities class action that went to trial resulted in a verdict in favor of the defendants. *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-1486 (N.D. Cal., Nov. 27, 2007). This was a significant loss for counsel that expended over five years of effort and millions of dollars in expenses.

114.   Other such case losses include *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd*, 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs presentation of its case to the jury); *Radol v. Thomas*, 772 F.2d .244 (6th Cir. 1985), *cert. denied*, 477 U.S. 903 (1986) (summary judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel merger); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir.), *cert. denied*, 493 U.S. 919 (1989) (verdict for defendants after trial).

115.   The many appellate decisions affirming summary judgments and directed verdicts for defendants also show that even where a securities fraud case survives a motion to dismiss, that is no guarantee of recovery. *See, e.g., Szlver v H&R Block*, 105 F 3d 394 (8th Cir 1997); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994); *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907 (7th Cir. 1994); *Sailor v. Northern States Power Co.*, 4 F.3d 610 (8th Cir 1993), *McGonigle v. Combs*, 968 F 2d 810 (9th Cir 1992); *Moorhead v. Merrill Lynch, Pierce, Fenner &*

33

*Smith Inc.*, 949 F.2d 243 (8th Cir 1991); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991).

116.    There are also other examples of plaintiffs in securities class actions who succeed at trial, only to find their judgment overturned on appeal.  *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after 24 years of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants, after 11 years of litigation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict in securities fraud case); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970) (judgment for $145 million overturned after years of litigation and appeals), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 373 (1973).

117.    Many other cases are lost on summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery.  *See, e.g., Eisenstadt v. Centel Corp.*, 113 F. 3d 738 (7th Cir. 1997) (Seventh Circuit affirmed the lower court's granting of summary judgment in favor of defendants); *Scans v. Glasser*, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd,* 64 F.3d 1061 (7th Cir. 1995); *Convergent*, 721 F. Supp. at 1133 (summary judgment against plaintiffs following five years of litigation), *aff'd*, 1991 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991), *amended*, 948 F.2d 507 (9th Cir. 1991).

118.    Losses such as those described above are exceedingly expensive and can often threaten the survival of a law firm.

119.    Onlookers often focus on the aggregate fees awarded, but fail to consider that those fees are used to cover enormous overhead expenses incurred during the course of the litigation, are

34

taxed by federal, state and local authorities, and, when reduced to a bottom line, are far more modest to each attorney involved than the aggregate fee awarded might suggest.

120.     Moreover, a law firm engaged in contingent litigation loses the use of funds that are invested in the case.  Lawyers representing fee-paying clients receive their fees almost immediately, which are then available to them for investment, which in turn creates additional revenues for them. A contingent lawyer, on the other hand, loses the use of these monies and income streams.

121.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, including groups of individual investors, can obtain parity in representation with that available to large institutional interests.  If this important public policy is to be carried out, the courts should award fees which adequately compensate private Plaintiffs' Counsel, taking into account the risks undertaken with a clear view of the economics of a securities class action.

**E.     The Reaction of the Class Further Confirms That the Requested Fee Is Reasonable**

122.     More than 6,479 copies of the Notice were mailed to potential Class members advising them that Plaintiffs' Counsel intended to apply to the Court for an award of attorneys' fees and reimbursement of expenses.  As of May 19, 2008, no objections have been received.

123.     Lead Counsel and Liaison Counsel advanced or incurred all of the expenses of this action.  From the beginning of the case, Plaintiffs' Counsel was aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the action was

successfully resolved.  Plaintiffs' Counsel, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this Action.  Thus, Plaintiffs' Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

124.    In view of the complex nature of the Action, the expenses advanced or incurred by Plaintiffs' Counsel (consisting primarily of filing fees, shipping and postage costs, travel expenses, expert fees, and copying costs) are reasonable and necessary, and were directly related to the pursuit of the interests of the Class.

### F.    Award to Lead Plaintiff

125.    Plaintiffs' Counsel request an award of $40,000 to the Lead Plaintiff Stephen Mazur pursuant to the provision in the PSLRA which states: "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. § 78u-4(a)(4).  Lead Plaintiff has submitted a declaration detailing his time spent representing the Class, including time spent preparing for, providing testimony in a deposition conducted by Defendants, monitoring the litigation, and attending the mediation.   As set forth in his Declaration, Stephen Mazur expended over 318 hours representing the Class in this Action. *See* Mazur Declaration, attached hereto as Exhibit C, ¶11.   From the outset of the litigation to settlement, Mazur conscientiously monitored the litigation, and participated in prosecuting the case, including participation in discovery, subjecting himself to deposition, and reviewing significant pleadings, briefs, motions, orders and deposition transcripts. *Id.*, ¶10. The Notice states that Mazur will seek

36

an award in an amount not to exceed $40,000, and no member of the Class has objected to that amount.

## V.    CONCLUSION

126.    For the reasons set forth above and in the accompanying Memorandum of Law, Plaintiff respectfully submits that (1) the Settlement is fair, reasonable and adequate and should be approved; and (2) the application for an award of attorneys' fees and expenses and award to Mazur is also fair, reasonable and adequate, and should be granted.

malta436404-00b.wpd

37

## DECLARATION OF ROBIN SWITZENBAUM

The foregoing is true and correct to the best of my knowledge, information and belief.

Executed under the penalties of perjury on this 22nd day of May, 2008 in Philadelphia, Pennsylvania.

Robin Switzenbaum

malta436404-00b.wpd

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on May 23, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

**Hilarie Bass**
bassh@gtlaw.com

**Holly Robin Skolnick**
skolnickh@gtlaw.com

I FURTHER CERTIFY that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

N/A

       s/ Julie Prag Vianale
Fla. Bar No. 0184977
jvianale@vianalelaw.com
Vianale & Vianale LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Tel: 561-392-4750
Fax: 561-392-4775